Good morning, may it please the Court, I'm Kari Hong, I represent Petitioner Gene Barthold. There are six reasons as to why the BIA erred, three in the appeal, three in the motion to reopen. The Court only has to agree with one in order to grant relief. Turning first to the motion to reopen, the BIA erred in contending that the current conditions in Haiti did not constitute a material change. In 2003, the immigration judge had found that there was no well-founded fear because according to a 1998 report, the conditions were improving and there wasn't evidence of politically motivated violence. In its first brief at page 31, the government defended this finding because, quote, our seed remained in power and there's nothing from which to conclude that petitioners should fear return because of our activist support for our seed in 1990 and 1991. In the motion to reopen, Ms. Barthold produced 55 articles and an expert opinion showing that our seed was overthrown in February 2004, that there was a violent campaign against our seed supporters, especially those who had been politically active in 1990 and 1991. Counsel, if we agree with you, what do we do? Well, under Malti, the proper remedy is to remand the case for the BIA, remand to the BIA. And that would be to consider the evidence that there's been a change in country conditions since the IJ issued his ruling. Correct. And is this required to be an individualized? I mean, how individualized does it have to get? Well, under Marcos, it has to be individualized, that there has to be... Because you've only provided just general, you've only provided general articles, nothing, no additional evidence that would suggest that she's been targeted or threatened. Other than the expert declaration by the former UN observer, who said that based on his understanding of her declaration, what has happened to her, she does face an individualized risk. But he doesn't know her and he doesn't know people who have threatened her. Correct. So it's still a very, very general, a pretty high level of abstraction still. Correct. But nonetheless, the remand would be the proper remedy in that instance. Would you, for my benefit, and I don't want to call off the panel, but for my benefit, would you talk about the 1992 incident in Miami? Sure. Sure. Turning to that issue and the direct appeal, what happened is that Ms. Barthold entered the country. So you concede at this point that she was in the United States illegally in March of 1992. Yes. And that she lied directly to the IJ after repeated questioning. She, yes. In her motion to reopen, it's explained that she did come forward. Just to put in context, though, that the court needs to look at the context in which lies are made, that Torsio's and Akinmati make it very clear that a lie regarding an admission in particular does not necessarily defeat an asylum claim, especially in pre-Real ID cases. How long was she been in the United States in 1992? So she entered in March of 1992, and she was held at Crome in Miami? I don't recall where she was detained, but, yes, it was 1992. But it was Miami where she was picked up, is that correct? Correct. And how long was she in the United States? Continuously from 1992 on. She never went back to Haiti? No. She stayed in the United States, and what happened is that she had a notario, a non-lawyer. How did she get back here in 1996? She was in the country the whole time. From 1992 to 1996 she was in the country? Correct. And what happens is that when she first applied for an asylum application, she did not use a lawyer. The organization told her that she should stay in 1996 if she's ever asked. So all of the story about staying with Nancy and all of that is all made up? Correct. Correct. So let me go back to that. This is why I'm having, maybe sharing with you, a little bit of a chronological problem. So let me start first with one of the things the immigration judge said. She claimed that she was arrested by authorities for being pro-Estrite, but it was after he won the election but before the coup. Right, in that four-month period between 1990 and spring of 1991. So that doesn't really make sense to me as to why authorities would arrest her when the person is in power for whom she has given support. Can you explain this? Well, and the expert talks about that, too, that he says that that actually is consistent with what was occurring at the time. I think in part because Haiti does not have a strong police force and a strong military, that they still probably had allegiance to the former regime, and these rogue officers were able to take advantage of that and arrest her. What's important is that the government never found, never introduced evidence to dispute that, to undermine that. So the immigration judge could not rely on speculation alone to discount that part of her testimony when there wasn't any other indicia of lacking credibility. Going back then to the timing and the question of whether she should have submitted some kind of supplemental documents or corroboration, which the IJ, I guess, asked her if she had anything more. The Nancy story falls out if she was in the United States during that period. Right, and for her chronology, the arrest happened. Usually you might say, well, it really doesn't matter if you lie about how you got in because that doesn't go to the heart of your claim. But if that lie unmasks the situation vis-a-vis this phantom or potentially phantom friend, Nancy, isn't there a relation here that you wouldn't normally have? Well, I would contend that it isn't because she was persecuted by the arrest in 1990 or 1991, and then the most brutal rape and the murder of her husband and sister occurred in the fall of 1991, and then she came into the country in 1992. So the fact that she said later that it came in 1996 or it was in hiding between 1992 on is not inconsistent with the heart of her claim. The heart of her claim is the persecutory events that occurred in 1990 and 1991. Why didn't she apply for asylum in 1992? That is not in the record, Your Honor, but we do have the fact that she suffered from lupus and also that she has the development level of a 7-year-old, that she does not have the same capacity and assumptions that I think other adults should get. What happened to lead her to apply for asylum? She got picked up by the INA? No, no, it was an affirmative application. So she initiated that on her own in 1996. A friend referred her to this organization in Florida. They filled out the documentation. She's completely illiterate in both Creole and English. She only knows how to sign her name, so she never read what was in it. She told them what had happened, and they just coached her to say that she came in 1996, and so she repeated that coaching. Ordinarily, our review on an adverse credibility determination is limited to the reasons cited by the IJ. Did the IJ specifically cite his disbelief, which apparently now turns out to be well-founded, of the 1992 entry as a reason for disbelieving her? No. He classified that under a good moral character finding. He did not classify that under the adverse credibility. Under the adverse credibility, he cited five reasons that she hadn't given the precise date of the arrest, that her uncle had died and then been left to die, which is no inconsistency, death certificates weren't needed, the radio corroboration he turned against her, and then he just had generalized boilerplate language that she seemed vague or that she wasn't consistent, but the record does not bear that out. Under Zahidi, the boilerplate language without any further direction is not adequate. Sometimes we see an IJ who suggests that there should be corroboration, and it turns out that it's unavailable or would be very difficult for the person to find it, or there's some other reason for, in our review stature, to sort of put a corroboration requirement aside. Here you have a situation, in reading the transcript, I frankly had the impression that the IJ had some doubts, some real doubts about the 1992 story, and that was the reason there was a request for corroboration. Should we look at it through that lens? Well, under the case law, one has to weigh the explanation that Ms. Barkholt gave for not having the death certificate. It turns out that the Nancy story is false. Correct. You conceded that to us, so thank you for that. Doesn't that make his statement that he wanted corroboration of the Nancy incident loom larger? He didn't cite that in the adverse credibility finding, though. He mentioned that in passing, but that wasn't one of the five reasons that he found her not credible. He wanted the death certificates, and she said that they aren't available, they aren't produced, and she didn't have them. I thought at AR 132 he said that one of the things that was missing in terms of corroboration was a statement from Nancy. Am I wrong about that? No, you are correct. But in his actual oral opinion, he did not cite that expressly. But even if he did, I would say in light of the motion to reopen, showing that she did admit that, it's important that the court has to look at is that lie material. And because saying that she was with Nancy in those four years that happened after the persecutory events, it's immaterial to what happened to her in Haiti. Okay. Our questions are taking a little over time. We'll allow you a little bit of time for rebuttal. Thank you. Thank you for your argument. We'll hear from the government at this time. Good morning, Your Honors. My name is Bo Stanton. I'm here today on behalf of the United States Attorney General. Does Mom call you Bo? Excuse me? Does Mom call you Bo? Yes, actually. She doesn't call you Timothy? No, no. She calls me Bo. Okay. And if you want to ask her, she's actually in the audience. But, yeah, this is an extremely complicated case with lots of issues and lots of sub-issues, as there's over 200 pages of briefing in this case. The government, however, contends that there are two primary issues in this case. First, whether the record evidence compels the conclusion that the petitioner testified credibly before the immigration judge. And second, whether the Board of Immigration Appeals abused its discretion in denying the petitioner's untimely motion to reopen. With respect to the first issue, the immigration judge found that the petitioner provided incredible testimony because of inconsistencies, impossibilities, and a lack of cooperation. Well, as was brought out in questioning of your opponent, he didn't cite the 1992 incident for purposes of breaching an adverse credibility determination. What do we make of that? You're correct, Your Honor. What had happened, the immigration judge gave three alternative bases in which to deny the petitioner her relief from removal, and one of those was in the matter of discretion, and that is where the untruthful story as to her entry is where he denied her relief from removal. He kept that. He separated each one of these out. He said, I found that you're untruthful because we have fingerprinting saying that, you know, you entered the country in 1992, you lied on the stand, and although the government attorney gave her multiple opportunities in which to give the truth, she stood by her story. And on that ground alone, he denied her because he found that she lacked a good moral character and then denied her relief on that basis. But that finding in and of itself was self-contained. That was only to support the matter of discretion. Then he went on to the adverse credibility determination and then looked at inconsistencies and plausibilities and a lack of cooperation. You can look at the opinion, and you can even look at the very end, the very conclusion of it. He once again separates it out. He says, found her untruthful, then went on to the adverse credibility determination, and then denied it on the merits. Well, it's quite current to my notes. The two things that the IJ principally relied upon was her memory about whether the first incident occurred in October or February. Yes, Your Honor. Is that right? Does that go to the heart of the claim? Yes, Your Honor. It does actually go to the heart of the claim. And when a witness says something happened, I can tell you the four-month period during which it happened, but I cannot tell you the exact month it happened. What had happened is this inconsistency you can't look at in isolation because the inconsistency also snows volunteer and plausibility. And what had happened here, if you go back and look at the testimony, the petitioner in this case testified that she was harassed, and then she was arrested sometime between October and February. She gave a five-month window on drug examination. She said, I don't know when it happened. It happened between this five-month span. Then on cross-examination, she once again reiterated that she didn't know. The government attorney, however, pinned her down and said, well, do you know what month? She's like, yes, it happened in February. And so she went from not knowing when it happened in a five-month span to emphatically stating that, yes, it happened in February. And then if it did happen in February, that was after President Araseed was not only elected, but he was in power. So he wasn't in full control of the government at that point. So this inconsistency. The Tantan Maku have been around for a long time. They're like the bloods, the crypts in Al-Qaeda. They'll probably be with us forever. And they seem to be able in Haiti to carry out their sometimes bloody activities, irrespective of who's in power. Correct, Your Honor. That is what happened in this case. And, in fact, the fact that they have been able to stay active and violent for so long through so many changes of administration strongly suggests that the government, whoever is in power, cannot control them. Isn't that true? That is not true, Your Honor. If you go actually and look at the record, the Ataches are actually unofficial supporters and I would say militiamen of the government in power. They're just another extension. They're like a de facto military operation. So they're like an extension of the government itself, in a sense, so to speak. And so if you look at the record, the way they're described is they, I guess I don't want to say they're like the crypts or the bloods or anything like that, but they are in that same vein almost. But, yeah, they are somehow connected to the government themselves, they say. However, though, in this case... Well, the record indicates that when people the Tantan Maku like are in power, they don't hurt people, but when people are in power that they don't like, they do hurt people. Is that correct? No. I mean, the record kind of has, I would say, both sides of the story in this case. They say, you know, they have certain parties they support, but then it also goes on to say in the record that it's whoever is in power that the Tantan Maku do support. So the record itself is inconsistent on this, a documentary evidence. But if you look at the testimony that's provided by the petitioner in this case, she emphatically states that these people were part of the government, that I was arrested by these people, taken downtown, and I was interrogated, I was brought before this police station. So this is the reason why the immigration found this is unbelievable, because this happened after President Erceg was in power. Her own testimony says the government did this, and the immigration judge found this was unbelievable. And just to go ahead and once again reiterate for the court, and I'm sure you're all aware, but it only takes one specific, cogent reason, supported by substantial evidence, that goes to the heart of the asylum claim to uphold the immigration's adverse credibility determination. And in this case, there are several. And in addition to the inconsistency, in addition to the impossibility, the immigration judge also found the inconsistency between the petitioner's declaration and her testimony. In her declaration attached to her asylum application, she found, she said that the --. Do you cite that as a reason for reaching an adverse credibility determination? Yes, he did, Your Honor. If you go to his opinion, it is on page 14 of his opinion. I don't have the actual AR number. I apologize for that. But it's page 14 in the opinion? It's page 14 in the opinion. Yes, if you go ahead and you look at the very beginning, he says these individuals came at a later time. We can read it. Okay, all right. I just want to let you know that he did, in fact, articulate this as a reason for denying her asylum or finding her incredible. And so she said in her declaration that, you know, these individuals came to her house, took her uncle, beat him, and left him in the woods to die. But then in her testimony, she said that he did die. This is an inconsistency. In one case, he didn't die. He was just left to die. You don't know what happened to him. But she didn't say he did die in the declaration, but she did die in the testimony. And under this court's precedent, if a fact is made to enhance a petitioner's asylum claim, it's looked unfavorably and is a reason to deny her asylum based on the credibility determination. So ultimately, the immigration judge noticed these inconsistencies and the possibilities and then said that she should have provided documents to corroborate her claim or at least showed that she had made an effort to obtain these documents. For example, he gave an example of maybe she should have got some death certificates or at least showed that she tried to get death certificates. Or maybe she should have tried to show that she got some documents to show that she participated in the political groups that she did or she said she did in Haiti. But she didn't do any of this. She said she relied on her testimony, which is found to be incredible. Is the immigration case pre- or post-Real ID? It's pre-Real ID Act. So it's one adverse credibility finding that goes to the heart of the claim. Yes, Your Honor. I don't want to have all your time run out before you address the motion to reopen. Yes. And in 2003, the IJ basically said there really wouldn't be a problem with future persecution. Things had resolved themselves sufficiently. That seems at odds with the BIA then says between 203 and 206, things are in the normal state of total disarray, bad economics, what do they say, current political, social, economic unrest has existed for years. So even within the BIA and the IJ, I see some conflict in the way they treat Haiti. Why isn't an abuse of discretion not to reopen so you can make a determination based on what's actually going on in Haiti at the time? I have a couple of responses, Your Honor. First, the petitioner in the case filed an untimely motion to reopen. Therefore, she had to show that she was entitled to equitoling or an exception to the timeliness requirement. And in this case, the board found that she didn't show that she had established changed country conditions in Haiti. In regards to that apparent conflict that you're discussing, what had happened is the immigration judge looked at the time from 1992 or 1999, excuse me, 1991, where she was allegedly raped and then during the coup. He looked from that point to the point where in 2003, he looked at that evidence and said during that time it had gotten better. But at the same time, if you look at the record, if you look at the evidence of the record, it shows that there were still extrajudicial killings. There were still pro-airside supporters getting killed at that time, even though he was still in power. Although there was, the conditions had gotten better. It had gotten better, I would say, from a complete point of where it was just a coup and people were just being killed in the streets to the point where it got to 2003. It was still better, but people were still being killed. His supporters were still being killed. And so what happened is the board goes back to not to 1992, but goes back to the time the immigration judge entered the decision. And you go back to 2003, and so if you compare that evidence of 2003 to the evidence of 2008, there isn't a dramatic change. Counsel, one other question. Do we even reach the question of the motion to reopen if we agree with the IJ's initial decision? No, Your Honor. It's only if we agree with the IJ's initial decision that we would even reach the motion to reopen. I believe so, Your Honor. Okay. Thank you for your argument. Oh, no problem. The red light's on. I didn't realize that, Your Honor. Thank you very much. And then I have a petition for you. Thank you. I'll give you one minute. Thank you. I just want to say that changed circumstances is an exception to the filing deadline in which to file a motion to reopen. It's unclear what could, if a coup does not meet that standard, it's unclear what could. And in addition, I just want to point out where the government said now that things were problems in 2003. The immigration judge said there weren't problems. The BIA in 2005 affirmed that decision. In its first brief, the government argued strenuously that there weren't problems in 2003, that there was no evidence of political violence. Under judicial estoppel, the government cannot assert one position and now change its mind. The BIA definitely cannot rewrite the record in its interest at this point to deny the motion to reopen. It either showed that the immigration judge was incorrect in 2005 or it was incorrect now. If we agree with the IJ's initial assessment and agree that she's incredible, there's no evidence to overturn that. Do you still have a motion to reopen? Absolutely, because CAT and withholding are mandatory remedies. In particular, CAT can be granted regardless of whether there's an adverse credibility determination. And there the BIA has a duty to assess everything and apply the facts as they exist. And under that standard, even if she were to be found completely incredible, the changed circumstances warrant a new hearing on that issue. Okay. Thank you both for your argument. You know sometimes in these immigration cases, the quality of advocacy does not live up to our expectations. This one met and exceeded it. We thank you for your candor and we appreciate it. And mom, he did just fine. The case just argued will be submitted for decision.
judges: Hawkins, McKeown, Bybee